**David Joe HARPER, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 90SC204.**

Supreme Court of Colorado,
En Banc.

Sept. 16, 1991.
Rehearing Denied Oct. 7, 1991.

David F. Vela, State Public Defender, David M. Furman, Deputy State Public Defender, Denver, for petitioner.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Clement P. Engle, Asst. Atty. Gen., Denver, for respondent.

Justice LOHR delivered the Opinion of the Court.

In *People v. Harper*, 796 P.2d 4 (Colo. App.1989), the Colorado Court of Appeals

affirmed the conviction of the defendant, David Joe Harper, for sexual assault on a child. The court of appeals held that the trial court did not abuse its discretion when it denied Harper's request to poll the jury after the mid-trial publication of a local newspaper article. We granted certiorari to decide whether the reasonable possibility of prejudice test announced in *Wiser v. People*, 732 P.2d 1139 (Colo.1987), required the trial court to poll the jury to determine whether any jurors had read the article. Although we conclude that the *Wiser* test is not the appropriate standard, we hold that the court abused its discretion in declining to poll the jury. We therefore reverse the judgment of the court of appeals.

### I.

In February 1988, Harper was tried in the Mesa County District Court, in Grand Junction, on charges of sexual assault on a child, in violation of section 18–3–405, 8B C.R.S. (1983 Supp.). Harper had allegedly molested a neighbor's eight-year-old daughter during November 1983. Harper had previously been convicted, in May 1987, of sexual assault on a child by one in a position of trust, § 18–3–405(2)(b) (current version at § 18–3–405.3, 8B C.R.S. (1990 Supp.)), stemming from an unrelated incident involving a five-year-old boy. The defense moved to exclude introduction of evidence of the May 1987 conviction in the February 1988 trial; the prosecution confessed that motion.[1] After the jury had been empaneled and before presentation of opening statements, the court instructed the jurors not to engage in outside reading on the case. The court specifically admonished them, "[D]o not read about the case in the newspapers or listen to radio or television broadcasts about the trial. You must base your verdict solely on the evidence presented at the trial."

On the second day of trial, The Daily Sentinel, a Grand Junction newspaper, printed a short article about the case. That article, located on page 4B, was included in a column entitled "News Shorts," containing three brief articles under the subheading "Grand Junction." The article in question read:

*Trial begins in sexual assault case*

Opening statements were to be made today in the Mesa County District Court trial of David Joe Harper on sexual assault charges involving a young girl.

Jury selection began Tuesday in the trial before Judge Charles Buss.

Harper, a 31–year–old New Mexico man, is seeking a new trial on his May 1987 conviction on sexual assault charges involving a 4–year–old boy [2] between Oct. 1 and Nov. 30, 1983.

In this trial, Harper is accused of assaulting the young girl during the same period of time.

The two offenses are not related, except that they occurred within the same time period.

Harper was convicted to six years in prison by Judge Jose D.L. Marquez after his May conviction. He filed an appeal in October alleging that actions by the Mesa County District Attorney's Office had denied him a chance to defend himself against the charge.

According to Harper's appeal, he was denied an effective defense because of the length of time in which the offense allegedly occurred. He couldn't claim he wasn't present at the time the child said she was assaulted because of the time span involved.

No action has been taken on Harper's appeal of the conviction in the first case.

Daily Sentinel (Grand Junction), February 10, 1988, at 4B.

Harper's counsel brought the article to the court's attention the next morning outside the presence of the jury. After describing generally the contents of the article, Harper's attorney asked the court to question the jury to determine whether any juror had read articles or learned extrane-

---

1. The prosecution did not waive use of the conviction for impeaching Harper's credibility. Harper, however, did not testify.

2. Other materials in the record indicate that the child was five years old at the time of the crime.

ous information about Harper.[3] The court received the article in evidence[4] but declined to question the jury because the defense had not established that any juror had read the article. The court explained,

> [t]he issue is if anybody's read it, and the Defendant has to establish, I think, independent of asking the jurors if they've read it, whether or not they've read it. The jurors are not subject to willy-nilly being examined during the course of a trial, whether or not they are currently obeying the Court's instructions regarding their behavior .... [A]ll the defendant has presented at this point is an article in the newspaper, *The Daily Sentinel,* which is not sufficient to show the jurors have been either exposed to it or disobeyed the Court's order not to pay attention to these matters.

The jury found Harper guilty of the sexual assault charge.[5] On appeal, the court of appeals noted that the trial court had admonished the jury not to read about the case in the newspapers. Relying on *People v. Holmes,* 191 Colo. 477, 553 P.2d 786 (1976), the court held that absent a showing to the contrary, the trial court's admonition created a presumption that the jurors followed the court's instructions to ignore newspaper articles concerning the trial. The court of appeals held that in absence of a showing that any of the jurors read the newspaper article or that Harper was prejudiced by the article, the trial court did not abuse its discretion by denying Harper's request to poll the jury. The court therefore affirmed his conviction.

## II.

Harper argues that the trial court abused its discretion by not polling the jury after Harper brought the newspaper article to the court's attention. In support of this argument, Harper asserts that the article was highly prejudicial as it contained information about the excluded conviction; counsel had brought the article to the court's attention promptly; and the ethical prohibition against counsel contacting jurors during trial, *see* DR 7–108, created a serious obstacle to obtaining additional evidence about the jurors' exposure to the article. Harper further asserts that polling would have indicated whether the jurors had been exposed to the article and if they had, the court then could have taken timely corrective measures to ensure him a fair trial.

■ Our earlier cases required that a defendant demonstrate that actual prejudice resulted from juror exposure to extraneous information or influences in order to be awarded a new trial. *See, e.g., Niemand v. District Court,* 684 P.2d 931, 934 (Colo.1984) (juror consulted Black's Law Dictionary for definitions of words used in court's instructions); *People v. Hickman,* 684 P.2d 228, 233 (Colo.1984) (reporter questioned jurors during noon recess); *People v. Dunoyair,* 660 P.2d 890, 895 (Colo.1983) (juror inadvertently failed to disclose acquaintance with prosecution witness); *People v. Thatcher,* 638 P.2d 760, 770 (Colo.1981) (jurors casually observed scene of the crime while returning home from court); *People v. Mackey,* 185 Colo. 24, 31, 521 P.2d 910, 914 (1974) (juror conversed with a police officer during sequestration concerning burglarizing of a room of one of jurors); *Thistle v. People,* 119 Colo. 1, 5, 199 P.2d 642, 643 (1948) (jurors read article including information that defendant was facing charges of absence without leave from army); *McPhee v. People,* 108 Colo. 530, 120 P.2d 814 (1941) (jurors read article referring to prior con-

---

**3.** After the defense counsel requested that the jury be polled, and before the trial court ruled, the prosecutor remarked, "Judge, if anybody's read this article, I think that [defense counsel] is entitled to question them on it."

**4.** The article was never submitted to the jury.

**5.** The trial court imposed an indeterminate sentence of one day to life imprisonment under the Colorado Sex Offenders Act of 1968, § 16–13–201 to –216, 8A C.R.S. (1986). The court of appeals vacated the sentence because Harper had been denied his right to confront witnesses during a sex offender evidentiary hearing and because the trial court erroneously concluded that Harper was ineligible for probation. *People v. Harper,* 796 P.2d at 6–7. These sentencing issues were not presented for certiorari review.

victions; case remanded for evidentiary hearing on actual prejudicial effect).[6] Particular factual circumstances, however, can create a rebuttable presumption of prejudice. *People v. Boulies*, 690 P.2d 1253, 1256 (Colo.1984) (presumption of prejudice arises if alternate juror was present during jury deliberations). *Cf. Walker v. People*, 169 Colo. 467, 471, 458 P.2d 238, 240 (1969) (pre-trial publicity so pervasive that actual prejudicial effect need not be shown). The principle to be derived from these cases is that an evidentiary hearing would generally be appropriate to determine the actual effect of the potentially prejudicial material on the jury's deliberations. *See McPhee*, 108 Colo. at 533, 120 P.2d at 815. *But see Quintana v. People*, 158 Colo. 189, 194, 405 P.2d 740, 743 (1965) (jurors' actual exposure to article describing defendant as ex-convict and describing sentence received by his co-defendant required reversal without the need for an evidentiary hearing on prejudicial effect); *Perry v. People*, 63 Colo. 60, 65–68, 163 P. 844, 846–47 (1917) (the possibility of jury prejudice resulting from false article about defendant's escape plans, including concealment of weapons in his cell, warranted new trial despite trial court finding of no prejudicial effect).

In *Wiser v. People*, 732 P.2d 1139 (Colo. 1987), we re-examined the problem of the exposure of jurors to information not presented at trial. Wiser had been convicted of first degree burglary and felony menacing, following a jury trial. During Wiser's trial, one juror asked a legal secretary about the source of jury instructions and another juror consulted a dictionary for a definition of burglary, one of the crimes with which the defendant was charged. This information was presented to the trial court by affidavit in support of a motion for new trial and was based on information gleaned from the jurors at an informal meeting after return of the verdict. The trial court held that even if the information was true, the evidence was insufficient to establish that the jury was prejudiced by the misconduct. The trial court therefore denied the new trial motion. The court of appeals affirmed. It recognized that the consultation of outside sources was misconduct but held that the defendant had the burden to establish that the misconduct was prejudicial. The court of appeals held that because the affidavits contained no information that the jurors' exposure to the information actually influenced their votes, the defendant had failed to carry his burden of establishing prejudice. *People v. Wiser*, No. 82CA0990 (Colo.App. Sept. 6, 1984) (not selected for official publication).

Upon certiorari review in *Wiser* we explained the problems inherent in a standard that requires the defendant to show that exposure to information outside the record caused actual prejudice. A longstanding common law rule proscribes jurors' testimony about their mental processes during their deliberations. *See* CRE 606(b), incorporating that rule.[7] We noted the problem of proof created because this proscription prevents inquiry into the deliberative process of jurors even though such an inquiry is necessary to ascertain actual prejudicial effect. *Wiser*, 732 P.2d at 1141. CRE 606(b)'s prohibition of any juror testimony about the effect of the extraneous information precludes introduction of the only relevant evidence about actual prejudice. *Id.*

In recognition of these evidentiary constraints, *Wiser* substituted an objective

---

6. In some of these cases, the issue of jury exposure to extraneous information did not arise until facts were learned after the verdict was returned. *E.g., Niemand; Dunoyair; Thatcher*. In *Mackey* the court denied a motion for mistrial after the facts came to light during trial.

7. CRE 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or *to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict* or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jurors' attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. (Emphasis added.)

test in place of the actual prejudice standard by which to assess prejudicial effect when the issue arises after completion of the trial. The trial court must determine the effect of the extraneous information or influences on a typical jury. *Id.* at 1142. A new trial is necessary when there is a reasonable possibility that the verdict was tainted by the introduction of outside information or influences into the jury deliberations. *Id.* at 1143.[8]

### III.

We must determine the appropriate manner of evaluating the prejudicial effect of media reports when the issue is presented during trial. The trial court refused to poll the jury because Harper had not presented independent evidence of the jurors' exposure to the article. The court of appeals affirmed the trial court, ruling in reliance on *People v. Holmes*, 191 Colo. 477, 481, 553 P.2d 786, 789 (1976). It did not cite *Wiser*.

### A.

In *Holmes*, decided before *Wiser*, we upheld the trial court's refusal to poll the jury after the mid-trial publication of a newspaper article about the trial. Immediately before recess on the night preceding the publication of the article, the trial court instructed the jury to ignore newspaper articles concerning the trial and to refrain from listening to newscasts on radio and television. The defendant presented no independent evidence showing that any juror had read the newspaper article.[9] Moreover, the trial court commented that the article in question could be interpreted as favorable to the defendant. Under these circumstances we adhered to the presumption adopted in *Hammons v. People*, 153 Colo. 193, 197–98, 385 P.2d 592, 595 (1963), that the jury had followed the court's instruction. *See also Tomsak v. People*, 166 Colo. 226, 229–30, 442 P.2d 825, 827 (1968). Therefore, we held that polling the jury was unnecessary.

We conclude that the rationale of *Wiser*, recognizing the difficulty of obtaining proof of jury prejudice, undercuts the analysis in *Holmes*. The *Holmes* decision is based principally on the presumption that jurors followed the trial court's instructions to ignore newspaper articles and the absence of a showing by the defendant that any of the jurors read the article in question. We characterized the defendant's motion to poll the jury as "based merely upon unsupported speculation that some member of the jury might have read the newspaper article and might have been prejudiced thereby." *Holmes*, 191 Colo. at 481, 553 P.2d at 789. This reasoning is flawed in two respects.

First, the newspaper article could have come to the attention of a juror inadvertently. *State v. Bey*, 112 N.J. 45, 548 A.2d 846, 865 (1988). If an article appeared in an inconspicuous location in a newspaper, as was the case here, a juror could have read it in whole or in part before becoming aware that it related to the case being tried, or perhaps a family member, a co-worker, or a friend could have mentioned the article. In such a situation the juror would have acquired the information without violating the court's instructions.

Second, requiring independent evidence of the jury's exposure to outside information as a prerequisite to polling the jury fails to acknowledge the significant obstacles to obtaining such evidence. Although CRE 606(b) permits juror testimony about exposure to extraneous prejudicial information, ethical rules prohibit counsel from communicating with jurors or their family members during the trial. *See* DR 7–108(B), (F);[10] *cf. People v. Radinsky*, 176

---

8. Although *People v. Garcia*, 752 P.2d 570 (Colo. 1988), did not explicitly employ the *Wiser* reasonable possibility of prejudice test, we held that a juror's discussion, during deliberations, of a newspaper article published before the trial did not prejudice the defendant in light of the overwhelming evidence of his guilt. *Id.* at 584.

9. In *Quintana v. People*, 158 Colo. 189, 405 P.2d 740 (1965), *McPhee v. People*, 108 Colo. 530, 120 P.2d 814 (1941), and *Perry v. People*, 63 Colo. 60, 163 P. 844 (1917), one or more of the jurors actually had seen the newspaper article.

10. DR 7–108(B) states:
 (B) During the trial of a case:

Colo. 357, 363, 490 P.2d 951, 953–54 (1971) (pretrial telephone inquiries by attorney's investigator to jury panel members about their attitudes towards insurance companies, large verdicts, and whiplash injuries constituted jury tampering). This ban on direct contact with jurors significantly hampers a defendant's ability to procure independent evidence of jurors' actual exposure to prejudicial information. Realistically, such evidence would be unavailable unless volunteered. *See Bey*, 548 P.2d at 866. This leaves a defendant with little recourse when extremely prejudicial extraneous material has been published.

A presumption that jurors follow court instructions not to permit themselves to be exposed to media reports, therefore, does not adequately take into account either the likelihood that a juror could acquire information without violating the court's instructions or the difficulty of discovering whether jurors were exposed to such a report. We conclude that to resolve the issue of prejudice on the basis of such a faulty presumption fails to provide adequate protection for the defendant's constitutionally based right to a fair trial.

### B.

The reasonable possibility of prejudice test articulated in *Wiser*, however, is not suitable for resolving the effect of media reports occurring during the trial when the issue of the prejudicial effect of such reports is presented before completion of the trial. The *Wiser* test requires a determination of whether there is a reasonable possibility that extraneous information or influence affected the verdict and requires for this purpose that the court consider the effect on a "typical jury." *Wiser*, 732 P.2d at 1132. This test envisions a situation where, as in *Wiser*, the issue does not arise until the trial has been completed and the jury discharged. In *Wiser* we held that

resolving the prejudice issue by the objective test enunciated in that case "is consistent with CRE 606(b)'s purpose of protecting the privacy of jurors," and "is also more likely to enhance the stability of jury verdicts than an approach that required jurors to reconstruct conditions of jury deliberations and retrace their mental processes sometimes long after a verdict has been rendered." *Id.*, 732 P.2d at 1142–43. These considerations have no applicability when the possibility of prejudice is broached during the pendency of the trial.

### C.

▮ Other courts have considered how to evaluate the possibility of prejudice resulting from mid-trial media reports when the defendant raises that issue during the trial. We derive from these cases an approach that will be consistent with the rationale of *Wiser* but will create an opportunity for the trial court to determine whether the reports in fact prejudiced the deliberations of the particular jury trying the case. The United States Court of Appeals for the Second Circuit describes a three-step process well adapted to accomplish this objective:

> The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on the juror's ability to decide the case fairly.

*United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). These inquiries must be conducted in the framework of the facts of each case, and the trial court has broad discretion in deciding the

---

(1) A lawyer connected therewith shall not communicate with or cause another to communicate with any member of the jury.

(2) A lawyer who is not connected therewith shall not communicate with or cause another to communicate with a juror concerning the case.

DR 7–108(F) states:

(F) All restrictions imposed by DR 7–108 upon a lawyer also apply to communications with or investigations of members of a family of a venireman or a juror.

ultimate issue of whether the media reports prejudiced the defendant's right to a fair trial. *Id.* Many other courts have adopted essentially the same procedure and standards for evaluating prejudice in these circumstances. *See, e.g., United States v. Thompson,* 908 F.2d 648 (10th Cir.1990); *Government of Virgin Islands v. Dowling,* 814 F.2d 134, 139–41 (3d Cir.1987); *United States v. Halbert,* 712 F.2d 388, 389 (9th Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *United States v. Trapnell,* 638 F.2d 1016, 1022 (7th Cir.1980); *United States v. Hood,* 593 F.2d 293, 296 (8th Cir.1979); *United States v. Crowell,* 586 F.2d 1020, 1024 (4th Cir. 1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *Brown v. State,* 601 P.2d 221, 232 (Alaska 1979); *Morris v. United States,* 564 A.2d 746, 748 (D.C.App.1989); *People v. Barrow,* 133 Ill.2d 226, 139 Ill.Dec. 728, 549 N.E.2d 240, 256–67 (1989), *cert. denied,* — U.S. —, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990); *State v. Bey,* 112 N.J. 45, 548 A.2d 846, 866–67 (1988); *cf. United States v. Herring,* 568 F.2d 1099, 1104–05 (5th Cir.1978) (failure to conduct required inquiry of jurors raises presumption of prejudice); [11] *People v. Adcox,* 47 Cal.3d 207, 253 Cal. Rptr. 55, 763 P.2d 906, 931 (1988) (court must make whatever inquiry is reasonably necessary), *cert. denied,* — U.S. —, 110 S.Ct. 1500, 108 L.Ed.2d 634 (1990); *Lynch v. State,* 588 A.2d 1138, 1139 (Del.1991) (presumption of prejudice if there is a reasonable probability of juror taint); *Commonwealth v. Duddie Ford, Inc.,* 28 Mass. App.Ct. 426, 551 N.E.2d 1211, 1215 (1990) (voir dire required if a serious question of possible prejudice arises) (citing *Commonwealth v. Jackson,* 376 Mass. 790, 383 N.E.2d 835 (1978)). *But see United States v. Metzger,* 778 F.2d 1195, 1209 (6th Cir. 1985) (jury presumed to follow court's instruction; defendant must show that jury violated the admonition), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986).

In implementing the first step, the trial court should focus principally upon whether the content of the media report is inherently prejudicial. Other relevant factors include whether the report contained information that would not be admissible at trial or that was not in fact adduced before the jury, *Crowell,* 586 F.2d at 1020, and how closely related the publicity is to the matters at issue in the trial, the timing of the publication, and the likelihood the jury was exposed to it, *Brown,* 601 P.2d at 232. *Cf. People v. McCrary,* 190 Colo. 538, 545, 549 P.2d 1320, 1326 (1976) (listing factors a court should evaluate to decide whether pre-trial publicity warrants venue change). The court also should consider the likely effectiveness of any instruction not to read, watch or listen to reports concerning the defendant or the trial in light of the nature and manner of dissemination of the news reports. The existence of admonitions, alone, does not sufficiently neutralize news reports in the community where the trial is being held that may reasonably be believed to have come to the attention of the jurors. *Trapnell,* 638 F.2d at 1022. *See also Thompson,* 908 F.2d at 651. Doubt about the existence of prejudice should ·be resolved by proceeding to step two and polling the jurors as a group. In many cases such a poll may disclose that the jurors did not learn of the report, making it unnecessary to question individual jurors. *See United States v. Baker,* 855 F.2d 1353, 1361 (8th Cir.1988), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). *Cf. Gallegos v. People,* 146 Colo. 546, 549, 362 P.2d 178, 179 (1961) (no merit to contention defendant was prejudiced by newspaper article admittedly not seen by any juror). When such individualized questioning is warranted, it should be conducted outside the presence of the other jurors. Ultimately, the trial judge, exercising informed discretion, must determine the prejudicial effect, if any, of the publicity. *Gaggi,* 811 F.2d at 51.

---

**11.** In *Bonner v. City of Pritchard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981.

## IV.

■ The newspaper article published during Harper's trial had great potential for unfair prejudice. The article discussed Harper's prior conviction for sexual assault on a child, the same type of offense for which he was prosecuted in the present case. It also related that the incident upon which the prior conviction was based took place sometime between October 1 and November 30, 1983, the same period within which he allegedly committed the crime for which he was on trial. Evidence of prior criminal convictions is generally inadmissible because of its highly prejudicial effect. *E.g., Martin v. People,* 738 P.2d 789, 794 (Colo.1987); *People v. Abbott,* 690 P.2d 1263, 1269 (Colo.1984). "[E]vidence of prior criminality casts 'damning innuendo likely to beget prejudice in the minds of juries.'" *People v. Lucero,* 200 Colo. 335, 343, 615 P.2d 660, 665 (1980) (quoting *Stull v. People,* 140 Colo. 278, 284, 344 P.2d 455, 458 (1959)) (disclosure of defendant's two prior felony convictions to jury panel at inception of trial among the prejudicial errors requiring a new trial).

Even in the limited circumstances permitting admission of prior convictions, *see, e.g.,* § 13–90–101 (prior convictions admissible to impeach a witness' credibility), CRE 404(b) (past crimes admissible for purposes including proof of motive, plan, absence of mistake), stringent standards apply and cautionary instructions must accompany the introduction of such prior convictions. *See, e.g.,* CJI–Crim. 4:07, 4:02, 2:02; *Hollis v. People,* 630 P.2d 68, 70 (Colo.1981); *Stull v. People,* 140 Colo. 278, 284–85, 344 P.2d 455, 458–59 (1959). The highly prejudicial information concerning Harper's prior conviction for sexual assault on a child certainly would taint the jury verdict if the jurors had been exposed to the newspaper article. *See Murphy v. Florida,* 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *Marshall v. United States,* 360 U.S. 310, 312–13, 79 S.Ct. 1171, 1172–73, 3 L.Ed.2d 1250 (1959); *Quintana v. People,* 158 Colo. 189, 194, 405 P.2d 740, 743 (1965) (newspaper article described defendant in aggravated robbery and conspiracy to commit aggravated robbery trial as an ex-convict and said a co-defendant was serving a sentence for his part in the robbery).

The taint created by juror exposure to the newspaper article would likely have had an especially serious prejudicial effect since the evidence against Harper was equivocal. The eight-year-old victim and her younger sister shared a bedroom and a bed in Harper's home where the children were staying while their mother was away. The incident occurred in the middle of the night. Although the children were acquainted with Harper, neither child could identify the perpetrator. The victim described the perpetrator generally as a male caucasian with a medium build and a full beard. Harper fit this description, but so did his brother. Evidence varied over whether the brother stayed at Harper's house during the night in question. There was also conflicting evidence whether one of the doors to the house was locked. Although additional circumstantial evidence suggested that Harper committed the crime, the evidence of Harper's guilt was not overwhelming. Evidence of his prior conviction for sexual assault on a child could have caused jurors to believe that Harper had a propensity to commit such a crime. The prior conviction would tend to substantiate the current accusation and cause the jury to overlook the inconclusiveness of the evidence against Harper. *See Trapnell,* 638 F.2d at 1023 (information about defendants' prior air piracy convictions might have prevented the jury from weighing fairly the instant air piracy and related kidnapping charges). The record adequately establishes the prejudicial effect of the newspaper article.

■ The circumstances of the article's publication present a reasonable possibility of jury exposure. The defendant did not assert mere vague speculation of possible prejudice. He identified a particular newspaper account having a specific and certain prejudicial content. The article appeared during the second day of trial in the local newspaper of a relatively small city. "[T]he court must investigate the asserted impropriety upon merely a colorable show-

ing of extrinsic influence." *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir.1990). On the other hand, the court had instructed the jury not to read media accounts of the trial. The article was short and located on an interior page of the paper, although the obscurity of the article may have led a juror to read it inadvertently. The trial court needed to evaluate these factual circumstances to determine the likelihood that the jury had been exposed to this significantly prejudicial material. *See United States v. Williams*, 809 F.2d 1072, 1092 (5th Cir.1987) (citing *United States v. Herring*, 568 F.2d 1099, 1105 (5th Cir.1978)), *cert. denied*, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987).

 In light of the article's highly prejudicial contents, some direct inquiry of the jury was necessary. *See People v. Swan*, 130 A.D.2d 6, 519 N.Y.S.2d 581, 583 (1987). "The more serious the potential jury contamination, especially where alleged extrinsic evidence is involved, the heavier the burden to investigate." *United States v. Harris*, 908 F.2d 728, 734 (11th Cir.1990) (quoting *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir.1985)), *cert. denied*, — U.S. —, 111 S.Ct. 979, 112 L.Ed.2d 1063 (1991). Polling the jury would provide an effective means of ascertaining that exposure. *See* ABA *Standards for Criminal Justice: Fair Trial and Free Press* 8–3.6(f) (2d ed.1986).[12] *See also, e.g., State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674, 680 (1991). The trial court should have proceeded to step two of the procedure described by *Gaggi* and questioned the jurors collectively about their exposure to the article. *Cf. United States v. Thompson*, 908 F.2d 648, 650 (10th Cir. 1990) ("At a minimum the court had a duty to ask whether the jurors had read the article concerning this case."). *Cf. People v. Adcox*, 47 Cal.3d 207, 253 Cal.Rptr. 55,

763 P.2d 906, 931 (1988) (failure to conduct reasonably necessary inquiry into juror prejudice would require reversal). Framing this inquiry in general terms would minimize any implication that an article containing information adverse to the defendant had been published.[13] Courts in other jurisdictions have recognized the utility of inquiry of the entire jury collectively after the publication of prejudicial articles. *See, e.g., United States v. Gaggi*, 811 F.2d 47, 51 (2nd Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *United States v. Trapnell*, 638 F.2d 1016, 1022 (7th Cir.1980); *United States v. Crowell*, 586 F.2d 1020, 1024 (4th Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1500, 59 L.Ed.2d 772 (1979); *Brown v. State*, 601 P.2d 221, 232 (Alaska 1979). Under the circumstances of this case, such collective questioning, in combination with the court's admonition, could have sufficed to establish absence of prior or prospective juror exposure to the article. *See United States v. Baker*, 855 F.2d 1353, 1361 (8th Cir.1988). The trial court's complete refusal to inquire about possible contamination constituted reversible error. *See, e.g., Government of Virgin Islands v. Dowling*, 814 F.2d 134, 141 (3d Cir.1987); *United States v. Williams*, 809 F.2d 1072, 1093 (5th Cir.1987), *cert. denied*, 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *State v. Bey*, 112 N.J. 45, 548 A.2d 846, 870 (1988).

### V.

 We hold that the three-step procedure outlined in *Gaggi* applies to possible juror exposure to mid-trial prejudicial publicity. The article at issue here was prejudicial to the defendant. The trial court erred in requiring independent evidence of juror exposure before questioning the jury

---

**12.** This standard provides:
 If it is determined that material disseminated during the trial goes beyond the record on which the case is to be submitted to the jury and raises serious questions of possible prejudice, the court may on its own motion or shall on the motion of either party question each juror, out of the presence of the others, about exposure to that material.

**13.** Some courts routinely question the jurors collectively at the start of each day's proceedings. *See, e.g., Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 495 (1st Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 185, 107 L.Ed.2d 140 (1989).

about exposure to the article. We therefore reverse the judgment of the court of appeals and direct that court to reverse the judgment of conviction and remand the case for a new trial.

ROVIRA, C.J., dissents, and VOLLACK, J., joins in the dissent.

Chief Justice ROVIRA dissenting:

Because the majority opinion undercuts the well established rule that jurors are presumed to follow a trial court's instructions, and overrules a recent decision of this court on the premise that a newspaper article "could have come to the attention of a juror inadvertently," maj. op. at 82, I respectfully dissent.

I

The petitioner was convicted of sexual assault on a child following a jury trial. Pertinent to the issues here, after the jury was selected and sworn the trial court declared a recess for the day and gave the jury a number of admonitions, including:

> Fourth, do not attempt to gather any information on your own. Do not engage in any outside reading on this case, and do not attempt to visit any places mentioned in the case.
>
> Finally [sic], do not in any other way try to learn about the case outside the courtroom.
>
> Fifth, do not read about the case in the newspapers or listen to radio or television broadcasts about the trial. You must base your verdicts solely on the evidence presented at trial.

The next day, February 10, 1988, before a recess, the trial court reminded the jury to follow the admonitions given, and again before excusing the jury for the evening, reminded them not to discuss the case. That evening, the local newspaper ran a short article about the trial on an inside page of the paper. *See* maj. op. at 79.

Upon the reconvening of court on February 11, defense counsel brought the article to the attention of the court and requested that the jury be questioned to determine whether any juror had read the article. The trial court declined, ruling that no poll was warranted absent some showing that one or more jurors had read the article.

The jury found the defendant guilty. In post-trial proceedings no effort was made by the defendant to establish that any juror had read the newspaper article. However, on appeal the defendant claimed that the trial court's refusal to question the jury about the article was reversible error.

The court of appeals, relying on *People v. Holmes*, 191 Colo. 477, 553 P.2d 786 (1976), affirmed, holding that it is presumed that the jurors followed the trial court's instructions not to read newspaper articles concerning the trial, and there was no showing by the defendant that any of the jurors read the article, or that he was prejudiced by the article. *People v. Harper*, 796 P.2d 4 (Colo.App.1989).

II

In *People v. Holmes*, the trial court admonished the jury not to discuss trial matters, to ignore newspaper articles concerning the trial, and to refrain from listening to newscasts on radio or television. A newspaper article concerning the trial was published during the overnight recess. After reconvening, the trial court refused defendant's motion to poll the jury in order to determine whether any jurors had read the article. In affirming the trial court's ruling, we adhered to the rule of law as expressed in *Hammons v. People*, 153 Colo. 193, 385 P.2d 592 (1963), that absent a showing to the contrary, it is presumed that jurors followed the trial court's instructions. Further, in the absence of any showing that the jurors had read the article, the defendant's motion to poll the jury was based upon "unsupported speculation" that some juror might have done so and might have been prejudiced. *Holmes*, 191 Colo. at 481, 553 P.2d at 789.

This court in *Holmes* established a rebuttable presumption test. If the jury has been instructed not to read newspapers, there is a presumption that the jurors followed the instruction, and the burden is on the defendant to rebut the presumption.

Colorado is not alone in adhering to such a presumption. It is presumed that jurors are "true to their oath and ... conscientiously observe the instructions and admonitions of the Court." *United States v. Greschner*, 802 F.2d 373, 381 (10th Cir. 1986), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). In *Greschner*, the jury was repeatedly admonished to not read any newspaper reports about the case and, applying a presumption of jury compliance with instructions test, the court refused defendant's motion for mistrial made five days after a newspaper article appeared. *See also United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir.1985), *cert. denied*, 477 U.S. 906, 106 S.Ct. 3279, 91 L.Ed.2d 568 (1986) (even if material presented in the news media is found to be prejudicial to defendant, unless there is a showing that the jury violated the instruction not to read newspaper accounts of the case, a presumption exists that the jury followed instructions and the conviction will not be reversed); *Rizzo v. United States*, 304 F.2d 810, 815 (8th Cir.), *cert. denied sub nom. Nafie v. United States*, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962), quoted in *United States v. Giacalone*, 574 F.2d 328, 335 (6th Cir.), *cert. denied*, 439 U.S. 834, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978) ("Where a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition."); *State v. Potts*, 205 Kan. 42, 46, 468 P.2d 74, 77 (1970) ("In the absence of evidence to the contrary this court will assume the jury followed the lower court's admonitions.").

The meritorious effect of the rebuttable presumption test is that it forecloses any assumption of noncompliance to instructions, inadvertently or otherwise. Whether a juror actively or inadvertently disobeys a jury instruction is irrelevant in the application of this test. The presumption is rebuttable and the moving party, upon presenting some evidence that a violation of the instructions occurred, would then be enti-

tled to have the court poll the jury, regardless of whether the violation happened actively or passively.

Other jurisdictions have held that upon a colorable showing by extrinsic evidence or colorable claim of misconduct, impropriety by jurors must be investigated. *United States v. Rowe*, 906 F.2d 654, 655 (11th Cir.1990); *United States v. Boylan*, 898 F.2d 230, 258 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). In this case, Harper presented nothing to the court to indicate that any juror was exposed to the relatively obscure newspaper article.

By requiring an investigation or polling on possible misconduct anytime it is alleged that media coverage could have come to the attention of a juror, the majority would require the trial court to poll the jury on far more occasions than would be warranted. Consequently, whenever a jury is not sequestered, the integrity of the jury would be undermined because, taken to its limit, jurors could be subjected to frequent interrogation regarding their activities during their time away from the courthouse. This may be offensive to jurors and, worse yet, they may be tempted by the subject matter of the questioning which would draw attention to potentially prejudicial outside influences. *See State v. Bentley Bootery, Inc.*, 128 N.J.L. 555, 27 A.2d 620, *aff'd*, 129 N.J.L. 386, 30 A.2d 27 (1943).

### III

It is true that counsel is prohibited from questioning jurors during trial and the majority finds that this prohibition hampers defendant's ability to procure independent evidence of exposure to outside sources in order to overcome the *Holmes* presumption. *See* DR 7–108(B), (F) set out in maj. op. at 82. Other channels exist for gathering of such evidence.[1]

For example, in the cases cited by the majority for the proposition that admonishments may not be enough to protect

---

1. *See, e.g., United States v. Rowe*, 906 F.2d 654 (11th Cir.1990) (judge's chambers received anonymous call from a man claiming to be a

juror and volunteering that he had overheard a discussion which was potentially prejudicial between other jurors in the jury room).

against inadvertent exposure, some evidence was presented to show that the jury might have been inadvertently exposed to the media report. *See, e.g., United States v. Thompson,* 908 F.2d 648, 652 (10th Cir. 1990) (where prejudicial article appeared in business section of local paper, jury should have been polled despite admonishments because counsel presented evidence that certain jurors were seen reading business section of the newspaper that published article on a different day and also seen reading national business newspaper and these jurors were likely to have read local paper's business section on day prejudicial article appeared); *Mares v. United States,* 383 F.2d 805 (10th Cir.1967), *cert. denied,* 394 U.S. 963, 89 S.Ct. 1314, 22 L.Ed.2d 564 (1969) (newspaper article appeared under bold headline).

Some jurisdictions determine whether the trial court properly exercised its discretion on whether to investigate potential juror misconduct based on a continuum considering the extensiveness of the media coverage of the case. Where the moving party offers evidence of broad coverage by the media, courts often find that the jury was inadvertently exposed. *See United States v. Williams,* 809 F.2d 1072, 1092 (5th Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *United States v. Trapnell,* 638 F.2d 1016, 1023 (7th Cir.1980). *See also United States v. Gaggi,* 811 F.2d 47, 52 (2d Cir.), *cert. denied,* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987) (court held jury should be polled because case involved a notorious murder trial in New York City and there was extensive media coverage following the murder of the defendant by every newspaper, radio and television station in New York City); *United States v. Trapnell,* 638 F.2d at 1022 (admonishments held insufficient where two of the local papers and a local radio news report in a small town reported on the case); *United States v. Williams,* 809 F.2d 1072 (the court should have granted *voir dire* of the jury when one newspaper carried front page headlines, the other daily ran a story on page 27, and the local television and radio stations reported on the story). In all of these cases, more evidence for believing inadvertent juror misconduct occurred was presented to the court than here where defendant simply cited the existence of a short article on the inside page of a local paper in his motion to poll the jury.

The prohibition against juror-counsel contact during trial does not bar a remedy for a defendant who believes that the jury might have been exposed to prejudicial outside information. CRE 606(b) permits juror testimony about whether extraneous prejudicial information was improperly brought to the juror's attention.[2] CRE 606(b) applies after the verdict is entered but allows an aggrieved defendant an opportunity to move for a new trial based on juror misconduct. C.R.C.P. 59(d)(2). While it is improper to inquire into a juror's actual mental processes, CRE 606(b) does allow a party an opportunity to provide the court with evidence of extraneous influence in an effort to overcome the *Holmes* presumption.

There was no indication, either mid or post-trial, that any juror had read or been influenced by the newspaper article mentioning Harper's prior conviction. No post-trial motion was made by Harper alleging any juror misconduct.[3] The mere presence of any media coverage which could entice juror misconduct is insufficient ground for diversion from the presumption set forth in *Holmes.* The trial court is afforded the discretion to determine whether a sufficient showing has been made to necessitate questioning by the court on whether juror exposure actually transpired. Pure conjecture that jurors might inadvertently violate admonitions not to read outside newspaper articles is insufficient to require court ex-

2. The pertinent section of CRE 606(b) states: Upon inquiry into the validity of a verdict or indictment, ... a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jurors' attention or whether any outside influence was improperly brought to bear upon any juror.

3. Defendant did file a motion for new trial but based the motion solely on newly discovered evidence not related to any juror conduct.

amination of the jurors. *See People v. Green,* 323 Mich. 128, 35 N.W.2d 142 (1948).

The *Holmes* presumption is sufficient to permit the trial court to deny a request to question the jury unless the court has reason to believe that such inquiry would be fruitful. *See United States v. Pallais,* 921 F.2d 684, 686 (7th Cir.1990); *United States v. Thornton,* 746 F.2d 39, 50 (D.C.Cir.1984) (holding that trial court not required to conduct a *voir dire* on counsel's unsubstantiated suspicion where issue was whether jurors had overheard any part of a bench conversation).

### IV

The majority finds that the reasonable possibility of prejudice test of *Wiser v. People,* 732 P.2d 1139 (Colo.1987), is not the appropriate standard to apply in this case because that test applies to post-trial challenges. It then finds that the rationale of *Wiser,* recognizing the difficulty of obtaining proof of jury prejudice, undercuts the analysis of *Holmes.* Maj. op. at 82. I agree that *Wiser* does not apply but do not agree that *Wiser* undercuts *Holmes.* The tests articulated in these two cases both address juror misconduct but they apply to different stages of the process. The *Holmes* presumption is pertinent in determining whether the jury was, in fact, exposed to extraneous influences; *Wiser* tests whether such influences affected jury deliberations. The test in *Wiser* is not triggered until the presumption in *Holmes* has been successfully rebutted.

### V

The three-part test adopted by the majority has merit once the presumption of *Holmes* has been successfully rebutted and the trial court is satisfied that juror misconduct might have or likely occurred. However, to begin the analysis by a determination of the prejudicial nature of the media event assumes that if a potentially prejudicial news report appeared, the jury should be polled on whether they failed to heed their admonishments. In the present case, *Holmes* provides the correct standard to determine whether the trial court erred by denying defendant's motion to poll. I would uphold the ruling of the trial court and affirm the conviction.

I am authorized to state that Justice VOLLACK joins in this dissent.