Colorado Court of Appeals Opinions || November 5, 2015


Colorado Court of Appeals -- November 5, 2015
2015 COA 157. No. 14CA0487. People v. Larsen.



 Â 

 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 157

 
 



 Court of Appeals No. 14CA0487
 El Paso County District Court No. 12CR2825
 Honorable Barney Iuppa, Judge


 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Emmett Andrew Larsen,

 Defendant-Appellant.


 JUDGMENT REVERSED AND CASE
 REMANDED WITH DIRECTIONS

 Division I
 Opinion by JUDGE HAWTHORNE
 Taubman, J., concurs
 Berger, J., concurs in part and dissents in part

 Announced November 5, 2015


 Cynthia H. Coffman, Attorney General, Jay C. Fisher, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Lord Law Firm, LLC, Kathleen A. Lord, Denver, Colorado, for Defendant-Appellant

 
 Â 

 Â¶1Â Â Â Â Â Â Â Â  Defendant, Emmett Andrew Larsen, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of sexual assault on a child by one in a position of trustâpattern of abuse and one count of sexual assault on a child by one in a position of trustâvictim less than fifteen years of age. Defendant asserts that the trial court erred when it refused to poll the jurors regarding their exposure to a printed and online news article released midtrial that included prejudicial information that was not admitted at trial.

 Â¶2Â Â Â Â Â Â Â Â  We conclude that the court abused its discretion when it declined to poll the jurors by relying solely on the assumption that the jurors followed its admonitions to avoid printed and online news reports. We reverse defendantâs convictions and remand the case for a new trial because this error was not harmless beyond a reasonable doubt. We also address the cross-examination issue raised by defendant because it is likely to arise at a new trial.

 I. Background

 Â¶3Â Â Â Â Â Â Â Â  Victims, A.H. and K.H., moved to Colorado with their mother, S.L., to live with S.L.âs father, defendant. After learning that K.H. was sexually abused previously, defendant put K.H. in therapy.Â K.H. disclosed to her therapist that she was sexually abused by her uncle, T.J. The therapist reported this abuse to the Department of Human Services (DHS), and a caseworker, Patricia Hartman, was sent to interview A.H. and K.H.

 Â¶4Â Â Â Â Â Â Â Â  During this interview, K.H. discussed T.J. but did not accuse defendant of any sexual abuse. On the other hand, A.H. revealed that defendant had touched her breasts and vaginal area. Ms. Hartman proceeded to immediately arrange additional interviews with the children. A.H. reiterated during her follow-up interview that defendant had touched her vaginal area once and her breast area twice. K.H. confirmed that defendant had never touched her inappropriately.

 Â¶5Â Â Â Â Â Â Â Â  At trial, A.H. testified that defendant had touched her breast but did not touch her vaginal area. This testimony was contrary to her prior interviews and a note she wrote stating that defendant had touched her vaginal area. K.H. testified that although she originally said defendant did not touch her, defendant in fact had touched her breast area. In a transcribed phone call between defendant and S.L., defendant admitted that he had touched K.H.âs breast. He clarified, in a later interview with an investigator, that K.H. had placed his hand on her breast.

 Â¶6Â Â Â Â Â Â Â Â  The jury acquitted defendant of the charge involving the sexual assault of K.H. However, the jury convicted defendant of both charges involving the sexual assault of A.H., and he was sentenced to eight years to life in prison.

 II. Jurorsâ Potential Midtrial Exposure to News Article

 Â¶7Â Â Â Â Â Â Â Â  Defendant asserts that the court erred by declining to poll the jurors to ask whether they were exposed to an allegedly prejudicial news article released midtrial. We agree.

 Â¶8Â Â Â Â Â Â Â Â  After the parties presented their evidence, but before the jurors were dismissed for a three-day weekend, the court noted that a newspaper reporter was in the courtroom. The court admonished the jurors to avoid reading or discussing printed or online news articles.

 Â¶9Â Â Â Â Â Â Â Â  Following that weekend the trial was reconvened, and defense counsel told the court that a printed and online article about the case was released over the weekend. Defense counsel then asked the court to poll the jurors.Â 

 Â¶10Â Â Â Â Â Â Â Â  The court responded that it had anticipated that an article would be released over the weekend and referred to its admonition given before the three-day weekend. The court did not want to poll the jurors because it believed that if any jurors had read the article they would tell the court. Defense counsel again requested that the court poll the jurors. The court then provided a lengthier explanation:

 My problem is once we start down that road, then it may create more interest. And they have cell phones. They have access to the Internet by their phones. It may create more curiosity, and we may be putting gas on the fire rather than putting the fire out. If they are going to abide by my instructions, they will have abided by them already.

 The prosecution agreed that the courtâs admonishment was sufficient.

 A. Preservation

 Â¶11Â Â Â Â Â Â Â Â  Although the People agree that defendant preserved the issue of whether the jurors should have been polled, the People assert that any constitutional claims were not preserved. The People contend that because a specific constitutional objection was not made, we should review for plain error.Â 

 Â¶12Â Â Â Â Â Â Â Â  Constitutional arguments must be explicitly raised before the trial court. People v. Allman, 2012 COA 212, Â¶13. Explicit arguments alert the court to the defendantâs arguments and enable it to make a record. Id.

 Â¶13Â Â Â Â Â Â Â Â  Defendant asked the court to question the jurors under Harper v. People, 817 P.2d 77 (Colo. 1991). Specifically, he requested âthat the jury be polledâ and that the court âshould engage in the analysis of the Harper case.â The People assert that defendantâs request to poll the jurors did not preserve defendantâs constitutional claims. But defendantâs additional argument that the Harper analysis should be applied was a request that the court review the same constitutional claims at issue in Harper. Therefore, defendant properly preserved, constitutional or otherwise, the issue of whether he was prejudiced by the jurorsâ exposure to the news article.

 B. Standard of Review

 Â¶14Â Â Â Â Â Â Â Â  We review for abuse of discretion the trial courtâs determination of whether a newspaper article prejudiced the defendant. Id. at 83-84. The court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair. Dunlap v.Â People, 173 P.3d 1054, 1094 (Colo. 2007). Additionally, a court abuses its discretion when it misconstrues or misapplies the law. People v. Sieck, 2014 COA 23, Â¶5.

 Â¶15Â Â Â Â Â Â Â Â  If we determine that the court abused its discretion, we must then determine whether the error warrants reversal. See Liggett v. People, 135 P.3d 725, 733 (Colo. 2006). We review for constitutional harmless error whether the courtâs failure to question the jurors about their exposure to extraneous prejudicial information warrants reversal. People v. Jacobson, 2014 COA 149, Â¶11 (cert. granted Nov. 2, 2015). Reversal is required, unless the error was harmless beyond a reasonable doubt. Dunlap, 173 P.3d at 1091. â[I]f there is a reasonable probability that [the defendant] could have been prejudiced by the error, the error cannot be harmless.â Id. (alteration in original) (quoting Blecha v. People, 962 P.2d 931, 942 (Colo. 1998)). âThe inquiry âis not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.ââ People v. Fuentes-Espinoza, 2013 COA 1, Â¶48 (emphasis omitted) (quoting Sullivan v. Louisiana, 508 U.S. 275, 279 (1993)) (cert. granted Mar. 24, 2014).

 C. Analysis

 Â¶16Â Â Â Â Â Â Â Â  In Harper, our supreme court adopted a three-part test to evaluate possible prejudice when jurors are exposed to extraneous news articles midtrial:

 The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors â outside the presence of the other jurors â to ascertain how much they know of the distracting publicity and what effect, if any, it has had on the jurorâs ability to decide the case fairly.

 817 P.2d at 83 (quoting United States v. Gaggi, 811 F.2d 47, 51 (2d Cir. 1987)). This test must be applied to the facts of each case, and the trial court has broad discretion to determine whether the articles prejudiced the defendantâs right to a fair trial. Id. at 83-84.

 Â¶17Â Â Â Â Â Â Â Â  Initially, the trial court must determine whether the articleâs contents were inherently prejudicial. Id. at 84. Additional relevant factors include: whether the article contained information inadmissible at trial, how closely the information was related to issues at trial, when the article was published, and the likelihood the jurors were exposed. Id.

 Â¶18Â Â Â Â Â Â Â Â  The court found that the information contained in the news article was prejudicial. We agree that the information was inherently prejudicial.

 Â¶19Â Â Â Â Â Â Â Â  Although the article discussed several facts related to the trial, it revealed the following prejudicial information concerning the extent of defendantâs abuse of his daughter S.L.: âShe told authorities the abuse began at age 2 and continued into her teenage years, an arrest affidavit shows. The abuse included âfull intercourse,â the woman claimed.â The People assert that this information was not prejudicial to defendant because evidence of defendantâs sexual abuse was admitted into evidence via a pretextual phone call between S.L. and defendant. Although the call revealed defendantâs sexual abuse of S.L., that call did not indicate that the abuse included full sexual intercourse starting when S.L. was two years old. So, the evidence at trial did not encompass the prejudicial information discussed in the article.

 Â¶20Â Â Â Â Â Â Â Â  Defendantâs theory of the case was that any contact with the victims was accidental. As explained in defendantâs theory of the case jury instructions, defendant claimed that any contact he had with the victims was benign and appropriate. Furthermore, heÂ asserted that he never had sexual contact with the victims because any contact was not for the purpose of sexual arousal, gratification, or abuse. But information about defendantâs explicit sexual contact with a prior child-victim directly undermined his defense.

 Â¶21Â Â Â Â Â Â Â Â  Similar to Harper, the newspaper article included information about a prior sexual assault on a child, the same type of offense as the charges brought against defendant. 817 P.2d at 85. â[E]vidence of similar acts has inhering in it damning innuendo likely to beget prejudice in the minds of jurors . . . .â People v. Novitskiy, 81 P.3d 1070, 1072 (Colo. App. 2003) (alteration in original) (quoting Stull v. People, 140 Colo. 278, 284, 344 P.2d 455, 458 (1959)); see People v. Garner, 806 P.2d 366, 372 (1991) (explaining that Stullâs rationale for excluding other crime evidence still applied after adoption of CRE 404(b)). The information in the article that defendant had had sexual intercourse with S.L. from the age of two through her teen years could undermine his defense by âcaus[ing] jurors to believe that [he] had a propensity to commit such a crime.â Harper, 817 P.2d at 85. The harm caused by this information was amplified because the evidence was equivocal, asÂ demonstrated by the juryâs acquittal of defendant for the charge related to K.H. See Jacobson, Â¶Â¶20, 33.

 Â¶22Â Â Â Â Â Â Â Â  Harper stated that â[d]oubt about the existence of prejudice should be resolved by proceeding to step two and polling the jurors as a group.â 817 P.2d at 84. Given that mere doubt about the existence of prejudice requires polling the jurors, it follows that polling the jurors is appropriate when a court finds the information contained in the news article was prejudicial.

 Â¶23Â Â Â Â Â Â Â Â  We also conclude that there was a reasonable probability the jury was exposed to the article. Id. at 85-86. Midtrial, an article was published in a local newspaper on a Thursday night and was released online Friday morning. But before the jury was discharged for the weekend, the court instructed the jury not to read anything about the case in the newspaper or any other forms of media. Despite this admonishment, members of the jury may have inadvertently read the article because its title âCustody fight reveals a highly dysfunctional familyâ would not have immediately notified them that they were reading an article discussing defendantâs criminal case. Furthermore, publishing the article online and in the newspaper posed at least as great a risk of exposure to the jury as the article released solely through the newspaper in Harper.

 Â¶24Â Â Â Â Â Â Â Â  The People assert that the court did not abuse its discretion in deciding not to poll the jurors because the courtâs admonishment was thorough enough that there was no reasonable possibility they were exposed to the article. But admonitions alone are not sufficient to neutralize prejudicial news articles that may have come to the jurorsâ attention. See id.; see also Jacobson, Â¶29 (concluding that a trial court abuses its discretion if the sole basis for refusing to poll the jurors was the presumed efficacy of its admonitions). âNeither Harper nor any of these cases suggests that when possible jury exposure to extraneous information has been called to the trial courtâs attention, the court may decline to address inherently prejudicial content and potential for unfair prejudice.â Jacobson, Â¶24. Given the courtâs conclusion that the article was prejudicial and that its only justification for not polling the jurors was that it provided sufficient admonishments, it abused its discretion by not polling the jury. See id. at Â¶29.

 Â¶25Â Â Â Â Â Â Â Â  The People also contend that even if the court abused its discretion when it declined to poll the jury, any error was harmlessÂ beyond a reasonable doubt. See id. at Â¶11. Specifically, the People argue that (1) nothing in the record indicates that the jurors were exposed to the article; (2) defendant was convicted on the basis of A.H.âs testimony and prior statements that would not be bolstered by the information revealed in the article; and (3) the article mentioned nothing that was not already admitted at trial. However, as previously stated, we conclude there was a reasonable probability the jury was exposed. In addition, the information contained in the article revealed prior acts of sexual assault against a child less than fifteen years of age that could have caused the jury to conclude that it was more likely that defendant committed the sexual assault against A.H. Finally, the article contained inherently prejudicial information that was not admitted into evidence. Thus, we conclude that the trial courtâs error was not harmless beyond a reasonable doubt.

 D. Remand

 Â¶26Â Â Â Â Â Â Â Â  We now address the appropriate remedy on remand. The dissent would remand to the trial court to reconstitute the jury and conduct a hearing applying the three-part Harper test. We declineÂ to remand the case for a hearing and, accordingly, remand it for a new trial consistent with the remedy adopted by Harper.

 Â¶27Â Â Â Â Â Â Â Â  Our supreme court in Harper reversed the judgment of conviction and remanded for a new trial after it concluded the trial court abused its discretion by refusing to poll the jury. 817 P.2d at 87. Similarly, a prior division of this court reversed the judgment of conviction and remanded for a new trial. Jacobson, Â¶40. In both cases, the trial courts neither determined whether the information was prejudicial nor polled the jurors. Despite the lack of findings, the cases were not remanded to the trial courts to engage in the three-step test discussed in Harper. Instead, our supreme court and the prior division remanded for a new trial and did not suggest that remanding to reconstitute the jury was an alternative remedy.[1]

 Â¶28Â Â Â Â Â Â Â Â  We therefore reverse the judgment of conviction and remand the case to the trial court for a new trial.

 III. The Witnessesâ Cross-Examinations

 Â¶29Â Â Â Â Â Â Â Â  Defendant argues that by excluding evidence of DHSâs attempt to remove the victims from S.L.âs custody, the trial court denied hisÂ right to confront multiple witnesses. We disagree because the limitations placed on defendantâs ability to cross-examine the witnesses did not constitute an abuse of discretion. Given the importance of S.L.âs testimony, this issue is likely to arise again at a new trial and, thus, we address it. See People v. Marciano, 2014 COA 92M, Â¶19.

 A. Standard of Review

 Â¶30Â Â Â Â Â Â Â Â  A defendant has a constitutional right to confront and cross-examine witnesses. Krutsinger v. People, 219 P.3d 1054, 1061 (Colo. 2009). This right includes the ability to cross-examine witnesses about evidence tending to show bias or to impeach. People in the Interest of E.G., 2015 COA 18, Â¶27. But a defendant is not entitled to unlimited cross-examination. Merritt v. People, 842 P.2d 162, 166 (Colo. 1992). The court must ensure âthe sideshow does not take over the circus.â People v. Taylor, 190 Colo. 210, 213, 545 P.2d 703, 706 (1976). Unless the trial court restricts cross-examination to such an extent as to constitute a denial of the right to confrontation, the scope and limits of cross-examination are within the courtâs discretion. People v. Knight, 167 P.3d 147, 152 (Colo. App. 2006). Thus, we review for abuse of discretion a courtâs ruling on the permissible scope of cross-examination. People v. Gomez-Garcia, 224 P.3d 1019, 1023 (Colo. App. 2009).

 Â¶31Â Â Â Â Â Â Â Â  A court does not abuse its discretion unless its decision was manifestly arbitrary, unreasonable, or unfair. People v. Skufca, 176 P.3d 83, 89 (Colo. 2008). The court has discretion to limit questioning that is irrelevant, prejudicial, or confuses the issue before the jury. See People v. Saiz, 32 P.3d 441, 449 (Colo. 2001).

 B. Background and Analysis

 Â¶32Â Â Â Â Â Â Â Â  The prosecution completed S.L.âs direct examination and the court announced the evening recess. Ms. Hartman, a DHS caseworker, reported the childrenâs testimony to DHS and received an order from a magistrate to remove the children from S.L.âs custody. Although DHS was unable to locate the children, the issue was brought to the courtâs attention the following day before S.L.âs cross-examination. Defendant asked the court if he could question S.L. about DHSâs attempt to remove the children from her custody. The court ordered defendant not to cross-examine S.L. on that subject, but permitted defendant to cross-examine S.L. about anything that was the subject of direct examination.

 Â¶33Â Â Â Â Â Â Â Â  Defendant asserts that the courtâs exclusion of evidence related to DHSâs attempt to remove the children from S.L.âs custody the night before she was cross-examined and its prohibition against asking S.L. or other witnesses about this evidence, denied his constitutional right to confront these witnesses. He contends he was denied his right to confront the witness because the evidence:

 (1) would have assisted the jury in assessing S.L.âs credibility;

 (2) demonstrated that S.L.âs fears that DHS would take her children if she did not testify against defendant were well-founded and could have influenced her testimony and prior statements; (3) challenged Ms. Hartmanâs testimony that she did not threaten to take custody of the victims from S.L.; (4) impeached Detective Dabbâs testimony that he did not make a similar threat; and (5) refuted Officer Arndtâs testimony that he never coerced S.L. to initiate a pretextual call with her father.

 Â¶34Â Â Â Â Â Â Â Â  The People were not permitted to ask about DHSâs attempt to take S.L.âs children the night before and the courtâs instruction did not otherwise limit defendantâs ability to ask about topics raised during direct examination. Whether S.L. retained custody of the children was not a question before the court during defendantâsÂ criminal trial. Determining the reasons why DHS sought custody of S.L.âs children raises an entirely different set of legal and factual questions that were determined by a separate dependency and neglect proceeding in which S.L. ultimately retained custody.

 Â¶35Â Â Â Â Â Â Â Â  To the extent defendant asserts he needed to cross-examine S.L. about this specific incident in order to bolster her credibility, there was record evidence that DHS sought to take custody of S.L.âs children. S.L. testified that a dependency and neglect proceeding was filed against her and she was told there was a âstrong likelihoodâ DHS would succeed in taking custody of her children in that proceeding. She also testified that she felt threatened by the investigating officers and believed she needed to work with the authorities to protect her right to retain custody of her children. Additionally, she stated that she made the pretextual phone call to defendant because she was told it was the only way to retain custody of her children. Thus, defendant was allowed to discuss S.L.âs credibility in light of the ongoing custody dispute with DHS.

 Â¶36Â Â Â Â Â Â Â Â  We also address defendantâs argument that this evidence bolstered S.L.âs belief âthat if she did not do exactly what DHS and/or the prosecution believed she should do, she would lose herÂ children.â The courtâs actions would not have supported these fears because it countermanded the magistrateâs order and stated that â[t]he children are not going to be taken away from you.â Contrary to defendantâs assertion that S.L. testified under the shadow of threats by DHS and other witnesses when she was cross-examined, the court had just assured her that she could testify free of this alleged duress.

 Â¶37Â Â Â Â Â Â Â Â  In addition, the midtrial attempt to take custody of S.L.âs children was unrelated to the testimony of Ms. Hartman, Detective Dabb, and Officer Arndt. These witnesses discussed events that occurred before trial and only Ms. Hartman was in a position to comment directly on DHSâs attempt to remove the children from S.L.âs custody. Ms. Hartman stated that DHSâs attempt to take custody of the children was not connected to the prior alleged threats, but followed her report to DHS discussing the childrenâs testimony from the day before.

 Â¶38Â Â Â Â Â Â Â Â  Thus, the court did not abuse its discretion when it limited the cross-examination of witnesses by barring questions about DHSâs attempt to remove the victims from S.L.âs custody during the trial. Defendant had the opportunity to effectively cross-examine theseÂ witnesses and addressed the issue of threats to remove the victims from S.L.âs custody.

 IV. Pattern of Abuse Verdict

 Â¶39Â Â Â Â Â Â Â Â  Defendant asserts that the jury verdict is insufficient to support his conviction for sexual assault on a child by one in a position of trustâpattern of abuse because the juryâs verdict did not find he was involved in two or more incidents of sexual contact with the same child. We need not address this issue because we are remanding for a new trial and, thus, vacating this verdict.

 V. Conclusion

 Â¶40Â Â Â Â Â Â Â Â  The judgment of conviction is reversed, and the case is remanded for a new trial.

 JUDGE TAUBMAN concurs.

 JUDGE BERGER concurs in part and dissents in part.


 [1] We also note that the People conceded at oral arguments that the appropriate remedy was a remand for a new trial.

 Â 

 JUDGE BERGER concurring in part and dissenting in part.

 Â¶41Â Â Â Â Â Â Â Â  I agree with the majority that the trial court did not comply with the supreme courtâs holding in Harper v. People, 817 P.2d 77 (Colo. 1991). Although the trial courtâs refusal to poll the jury was based upon salutary motives, it nevertheless was inconsistent with Harper.

 Â¶42Â Â Â Â Â Â Â Â  I also agree that if any jurors were exposed to the news articles prior to the verdict, the impact was prejudicial. The articles contained inherently prejudicial information not admitted during the trial. If the jurors were exposed to the articles, that exposure requires reversal. Id. at 82.[1]

 Â¶43Â Â Â Â Â Â Â Â  However, I do not agree that the appropriate course of action at this time is to reverse the conviction and remand for a new trial without first pursuing less extreme alternatives. Instead, I would remand to determine if the jurors actually were infected by extraneous information during their deliberations.

 Â¶44Â Â Â Â Â Â Â Â  Whether a new trial is required depends on whether any juror was, in fact, exposed to the prejudicial news articles prior toÂ rendering the verdict. In Harper, the Colorado Supreme Court adopted procedures to evaluate the possibility of prejudice resulting from midtrial media reports. Id. at 83. A new trial is warranted only if inherently prejudicial extrinsic evidence actually infected the jury. Id. at 83-84.

 Â¶45Â Â Â Â Â Â Â Â  We do not know if the jurors saw or heard the prejudicial extraneous information contained in the articles. The trial court comprehensively instructed the jurors that they should not read or be in a position to hear extraneous information.[2] These instructions went well beyond those customarily given by Colorado trial courts. If the jurors heeded the courtâs admonition, there is no conceivable justification to reverse defendantâs convictions. However, if one or more jurors did not comply with the courtâs instructions and were exposed (either intentionally or inadvertently)Â to the news articles prior to the verdict, reversal is required. Id. at 82.

 Â¶46Â Â Â Â Â Â Â Â  We should examine all possible remedies that would enable us to resolve this question short of reversal while at the same time protecting defendantâs constitutional rights. Reversal of a conviction imposes substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendants to expend further time, energy, and other resources to repeat a trial; victims may be asked to relive their disturbing experiences. People v. Rediger, 2015 COA 26, Â¶60 (quoting United States v. Mechanik, 475 U.S. 66, 72 (1986)).

 Â¶47Â Â Â Â Â Â Â Â  Unlike the majority, I do not believe we are compelled by Harper to automatically reverse the judgment without evaluating less extreme alternatives. Harper did not consider any remedy other than reversal. Furthermore, the supreme courtâs most recent jurisprudence makes it plain that automatic reversal, except in specifically prescribed situations, is not the law of this state. See, e.g., People v. Novotny, 2014 CO 18, Â¶26.

 Â¶48Â Â Â Â Â Â Â Â  While there is a dearth of case law in Colorado regarding post-trial jury inquiry, CRE 606(b) permits jurors to testify whetherÂ âextraneous prejudicial information was improperly brought to the jurorâs attention.â Other courts have permitted post-trial inquiry of jurors under virtually identical rules and similar circumstances.

 Â¶49Â Â Â Â Â Â Â Â  The Tenth Circuit Court of Appeals required post-trial examination of jurors to determine if they had read a prejudicial newspaper article prior to the verdict. United States v. Thompson, 908 F.2d 648, 655 (10th Cir. 1990), as modified on rehâg (Oct. 10, 1990). The same remedy was ordered by the Fifth Circuit Court of Appeals in response to evidence that jurors had read articles about the defendantâs escape from jail while he awaited trial. United States v. McKinney, 429 F.2d 1019, 1031 (5th Cir. 1970); see also Gladney v. Clarksdale Beverage Co., Inc., 625 So. 2d 407 (Miss. 1993).

 Â¶50Â Â Â Â Â Â Â Â  Some courts have refused to reconvene a jury because too much time has elapsed since the trial. In Haugh v. Jones & Laughlin Steel Corp., 949 F.2d 914 (7th Cir. 1991), the Seventh Circuit Court of Appeals acknowledged the potential availability of this remedy, but declined to order a hearing in part because the case was already a decade old. Id. at 918-19; see also James v.Â State, 912 So. 2d 940 (Miss. 2005); State v. Rideout, 725 A.2d 8, 11 (N.H. 1999).

 Â¶51Â Â Â Â Â Â Â Â  There is no basis in Colorado law for establishing some artificial time period beyond which reconstituting the jury is impermissible. Colorado law permits the prosecution of criminal charges years after the events that constitute the alleged crime. Indeed, the General Assembly has abolished entirely the statute of limitations in some criminal cases. See Â§ 16-5-401(1)(a), C.R.S. 2015 (no statute of limitations for sex assault on a child). Like the Tenth Circuit, I see no principled basis to conclude as a matter of law that any specific interval is too long or that the holding of the hearing that I advocate after the passage of any particular amount of time would automatically violate a defendantâs due process rights. Instead, the trial court must make findings on whether the jurorsâ recollections are credible. If they are not, either because of the passage of time or otherwise, then the defendant must be given a new trial.

 Â¶52Â Â Â Â Â Â Â Â  I do not minimize the difficulties inherent in reconstituting the jury. Some jurors may no longer be within the courtâs jurisdiction or even could be incompetent or deceased. And, even if the jury isÂ reconvened, it is possible that the jurorsâ memories are insufficient to protect the constitutional rights of defendant that were addressed in Harper.

 Â¶53Â Â Â Â Â Â Â Â  But irrespective of how difficult the task may be and even if in the end it is futile, we should remand for a hearing to determine if the jurors actually obtained extraneous information from the newspaper article. If all jurors satisfy the trial court that they did not read or otherwise obtain the information contained in the articles prior to rendering the verdict, the conviction should be affirmed.

 Â¶54Â Â Â Â Â Â Â Â  This disposition gives full effect to Harper and protects defendantâs constitutional rights, but at the same time possibly avoids an unnecessary retrial.

 Â¶55Â Â Â Â Â Â Â Â  Accordingly, I respectfully concur in part and dissent in part.


 [1] I also agree with the majorityâs disposition of the cross-examination issue.

 [2] The court instructed the jury: âThis admonition about not discussing the case includes not tweeting, texting, blogging, or anything other type of electronic communication as we talked about yesterday . . . . Also, do not read or listen to any accounts or discussions of the case that may be reported by newspaper or other publications or by television or radio. And that also includes any Internet information, any court blogs. You are not to go Google anything about this case.â




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || November 5, 2015


Back